| | |
|---|---|
| **Federal Defenders**<br>OF NEW YORK, INC. | Southern District<br>52 Duane Street, 10th Floor<br>New York, NY 10007<br>Tel: (212) 417-8700 Fax: (212) 571-0392 |
| Tamara Giwa<br>*Executive Director* | Jennifer L. Brown<br>*Attorney-in-Charge* |

October 3, 2024

**BY ECF**

Honorable Lewis A Kaplan
United States District Judge
Southern District of New York
New York, New York 10007

Re: **United States v. Shatique Bland**
    **24 CR 374**

Dear Judge Kaplan,

      I write in advance of Shatique Bland's October 17, 2024 sentencing for one count of possession of a firearm and ammunition after a felony conviction (18 U.S.C. § § 922(g)(1) and (2)).  Mr. Bland is a 30-year-old man who suffers from low intelligence, cognitive impairment, and physical injuries from both before and during his time in custody at MDC.  Throughout his life he has been a target for emotional and physical abuse, in his home and schools as a child, and as an adult, and in the two years leading up to the instant offense, a neck stabbing, near fatal shooting, and motorbike accident.  At the time of his non-violent offense on June 18, 2023, Mr. Bland was suffering from severe, untreated alcoholism and addiction to marijuana, in addition to significant cognitive disabilities, and physical injuries that left him unemployed.  In June 2024, Mr. Bland signed a plea agreement.  Mr. Bland's plea agreement bars him from seeking a sentence of less than 51 months' imprisonment.  Accordingly, a sentence of 51 months' imprisonment is more than sufficient punishment in this case and any sentence beyond is unnecessarily harsh given the circumstances presented here.

      Mr. Bland is deeply remorseful for the actions that led to his current incarceration.  Until the June 18, 2023 incident, he had not had an encounter with the criminal legal system since 2013, and he knows that he cannot continue down the same path, especially with two young children he needs to care for at home.  He now understands that under no circumstances should he possess a firearm and realizes how his actions have not only jeopardized his life but jeopardized his family's dreams and wellbeing.  Mr. Bland is working hard to ensure that he can receive the necessary supportive services he needs for long-term success, including alcohol treatment and services for those with developmental disabilities.

      Since his arrest on August 18, 2023, Mr. Bland was incarcerated at Essex County jail and then transferred in October 2023 to MDC Brooklyn where he has suffered through horrific conditions of confinement.  During the course of his 15 months incarceration, Mr. Bland

reports that he "witnessed so many stabbings and deaths," resulting in his "fearing for [his] life and barely leaving [his] cell." Letter of Shatique Bland, attached as Exhibit A. Mr. Bland asks that the Court considers the inhumane conditions of his pretrial confinement, his mental and physical health issues, his traumatic upbringing, and his familial circumstances, when fashioning an appropriate sentence in this case.

## Background

Shatique Bland, the middle child of five children, was born December 25, 1993 in Queens, New York. Mr. Bland's mother, Jaudda Bland, describes her son as "loveable, thoughtful, caring, helpful," qualities he maintains today, despite a significantly difficult upbringing and early adult life. Letters of Support, attached as Exhibit B, at 4. Mr. Bland describes his childhood as "tough" and "rough," descriptors that understate the irreparable harm he has had to bear since his early childhood. Pre-Sentence Report ("PSR"), at 13. At just three years old, Mr. Bland was hit by a car driving down a street in Queens that dragged him down the street for two blocks. Mr. Bland suffered a head injury, broken clavicle, broken arm and broken leg, and hospitalized for nearly three weeks. The impacts of the injuries would prove to last a lifetime, and his mother noticed a lasting change in her son thereafter. Ms. Bland recounts that after the accident, Mr. Bland "started acting different." Ex. B at 4. The accident caused behavioral changes to Mr. Bland at a young age that continued throughout his lifetime and that likely contributed to the ongoing serious memory issues that he contends with to do this day.

Throughout Mr. Bland's life, his parents worked multiple jobs, most recently as a school bus driver and a home care assistant for children with special needs; however, their intense work schedules often left Mr. Bland and his siblings unattended and without adult supervision. It was during this time – alone and under the "care" of his two older siblings – that Mr. Bland suffered most. Because Mr. Bland's delays were obvious to those around him, his older siblings took advantage of him and tormented him, "physically abus[ing] him… put[ting] their hands on him, beat[ing] him up, and 'torturing' him." PSR at 13. Although Mr. Bland has been unable discuss the more serious instances of abuse he endured at their hands, his inability to cope with the memories of these traumas only further support their severity and is a common coping strategy for those suffering from Complex Post-Traumatic Stress Disorder. *See* Report of Dr. Edward Fernandez, attached as Exhibit C at 11-12. He recounted that he had experienced physical and emotional abuse at the hands of his eldest siblings, who threatened him further if he told their parents. Given his deep fear of his siblings, he never told his parents about what he experienced at home when they were at work.

In addition to the abuse at home, school also proved incredibly challenging for Mr. Bland. As his mother recounts, Mr. Bland started showing signs of delay at school in the second grade noting that he was "slower than his peers." When his delay became obvious to his mother, he was placed in special education, and she sought supportive services for him in the school. While Mr. Bland received some support at the schools, they were insufficient to meet his needs. Things only worsened when Mr. Bland's parents separated. Mr. Bland continued acting out in school and not attending classes. When he moved with his mother to Queensbridge, he continued attending school in Long Island City, placing him in serious physical danger due to

2

longstanding rivalries between the neighborhoods during that time. Between the instability, the sibling-led abuse at home, and the challenges at school, Mr. Bland began spending time with kids in the streets that led him down the wrong path. As his mother observes, Mr. Bland "has always been quick to embrace people. He thinks they are his friends, no matter what I've told him. The people he was with were not his friends." Ex. C at 6. It was then in the eleventh grade that Mr. Bland was arrested for the first time, causing him to drop out of high school.

Despite his difficult life, as an adult Mr. Bland has built his own loving family and continues to be a pillar of support for his parents, siblings and community. He met his current partner Felicita Aiken seven or eight years ago, and together they are raising two children. Of her relationship with Mr. Bland, Ms. Aiken writes, "I am very lucky to have fallen in love with the love of my life, Shatique Bland, who has proven to be a great stepdad to my oldest son ▇ and a great father to my youngest, ▇ Ex. B at 1, Letter of Felicita Aiken. Before his incarceration, Mr. Bland was a crucial support to his children, "keeping ▇ on a straight path, raising [his] boys to be strong young black men and to never make [the same] mistakes." *Id.* Mr. Bland similarly helped raise his younger siblings, dressing them and picking them up from school and caring for them when his mother was hospitalized. When his younger brother was shot, Mr. Bland was his caretaker, "chang[ing] his colostomy bag and giv[ing] him spongebaths." Ex. B at 4, Letter of Jaudda Bland. He also frequently helped care for his cousins when his aunt couldn't afford childcare.

Mr. Bland's father Gary Scott describes Mr. Bland as "outgoing and helpful… at his core a wonderful person." Ex. B at 3, Letter of Gary Scott. Though his dad "stopped being there" for Mr. Bland after moving out of Mr. Bland's childhood home when he was 11 or 12 years old, as an adult, they maintain a positive and supportive relationship now. PSR at 13. Mr. Scott suffers from serious kidney issues, and he writes that prior to Mr. Bland's 2023 arrest, "Shatique was the one who would take me to all my doctors and help me go get my medicine." Ex. B at 3, Letter of Gary Scott. Mr. Bland is sorely missed by his family who relied on his generosity, care, and support.

Beyond supporting his immediate family, Mr. Bland remained involved in his local community, specifically for young kids in the neighborhood. Ms. Aiken describes how, before he was arrested, Mr. Bland would take ▇ to volunteer and feed the homeless, and how Mr. Bland "helps the kids around the neighborhood stay out of trouble by doing things like taking them to the movies and playing games with them." Ex. B at 1, Letter of Felicita Aiken. Mr. Bland's aunt likewise describes how before his incarceration, he "showed and taught [local] youngsters how to ride bikes and played sports with them when their fathers weren't present." Ex. B at 4, Letter of Jaudda Bland. In this way, Mr. Bland served as a stand-in father figure for neighborhood children. By encouraging local youth to engage in positive activities like sports, he sought to help "keep them out of trouble." Ex. B at 6, Letter of Towana Bland Steven. He's known as a "gentle giant… loving, lovable, caring, and funny," not only a "tremendous father and son," but also an anchor in his local community. *Id.* Writes his mother, "[e]veryone who has come across his path always tell me, "you have an awesome, caring, loving, and helpful son."" Ex. B at 4, Letter of Jaudda Bland.

3

Despite cognitive delays and mental health challenges, over the past decade, Mr. Bland has continually sought and maintained employment. He worked for UberEats about five years ago. He worked the night shift cleaning gym equipment from 2019 – 2021 at the New York Sports Club, and he worked from 2021-2023 as a security guard for MPS Security, and for ABC Super Store.

Several traumatic incidents punctuated the last five years, interrupting Mr. Bland's ability to work. He had only worked as a delivery person for UberEats for two months when he was struck by a car during the job. In 2020, shortly after the birth of his son Zakani, a fire broke out in the apartment below the apartment Mr. Bland and his family lived in. Mr. Bland and his partner, new infant, and young child lost their apartment and were forced to relocate to a family shelter as a result of the fire. Shortly thereafter, in 2020 or 2021, Mr. Bland was attacked by a group of men who stabbed him in the side of the head and robbed him. Mr. Bland was hospitalized and remains scarred, physically and emotionally, by this violent robbery. Just a year later, a stray bullet from a nearby shooting grazed Mr. Bland's neck—leaving him just a few millimeters from death. In 2023, weeks before his instant offense, Mr. Bland was shot three times in the left kneecap and groin.[1] This string of near death, traumatic experiences impacted Mr. Bland's ability to work and left him with significant, untreated psychological and physical injuries.

Throughout the years, most notably after his state incarceration, Mr. Bland turned to alcohol and marijuana as a coping mechanism. As his fiancée Felicita Aiken describes it, Mr. Bland was a "heavy drinker" and believed that if he "drank enough[,] his problem would go away." Although there were some respites in Mr. Bland's drinking, he would drink heavily to manage life stressors. Mr. Bland, at times, was drinking approximately a bottle of tequila on a daily basis. Indeed, on the night Mr. Bland himself was shot in the leg – an injury that he still has yet to receive any medical attention for despite continued mobility issues and serious pain while housed in at the MDC Brooklyn – he was drunk after having finished an entire bottle and can barely remember the events of that night due to his intoxication. Ms. Aiken also recalls that Mr. Bland began drinking heavily again when she miscarried three days prior to Mr. Bland's

---

[1] The person responsible for shooting Mr. Bland, Adam Bonano, was on federal supervised release at the time of the shooting for having previously been convicted of conspiring with others to distribute cocaine base, in violation of 21 U.S.C. § 846. As a result of shooting Mr. Bland, who was unarmed, Bonano was charged federally, pled guilty to felon in possession of ammunition, and was sentenced to 48 months' incarceration – three months lower than the stipulated guidelines range here. *See United States v. Bonano*, No. 23 Cr. 645 (LTS), ECF No. 18 (S.D.N.Y. May 1, 2024). Since Bonano was on federal supervised release at the time he shot Mr. Bland, he also received a sentence of 14 months to run consecutively, totaling 62 months' incarceration. *United States v. Bonano*, No. 13 Cr. 957 (LTS), ECF No. 18 (S.D.N.Y. May 1, 2024). Given that Mr. Bland at no point is alleged to have used the gun, fired it, or even threatened to use it against another, it would be unjust to give Mr. Bland a sentence above 51 months' imprisonment.

arrest in the instant offense. The loss of their child greatly impacted Mr. Bland, as one of his greatest joys in life is being an active and present father for his two sons.

    Mr. Bland looks forward to returning home to his family to provide his children with the stability that they have been lacking since his incarceration. As Ms. Aiken explains in her letter, Mr. Bland's incarceration has been particularly challenging on the children, as they have had to deal with the repeated trauma of Mr. Bland's gunshot injuries, the miscarriage, and now his absence due to incarceration.

## **Intellectual Disability**

    Mr. Bland has suffered from cognitive delay, memory problems and emotional trauma, for as long as he and his family can remember. His intellectual and emotional disabilities have long gone untreated, and compounded with untreated alcohol and marijuana addictions, likely contributed to the instant offense. Our office retained a psychologist, Dr. Edward Fernandez, to better understand Mr. Bland's mental health and cognitive functioning and provide potential treatment recommendations. According to Dr. Fernandez, Mr. Bland's intellectual functioning was assessed using the Wechsler Adult Intelligence Scale–4th Edition (WAIS-IV), and he achieved a Full-Scale IQ (FSIQ) of 82, placing him in the low average of intellectual functioning. Ex. C at 8. His overall thinking and reasoning abilities exceed those of only approximately 12% of individuals his age.

    The FSIQ is composed of performance scores on tests measuring verbal comprehension, perceptual reasoning, working memory and processing speed. As Dr. Fernandez's evaluation stated, Mr. Bland's performance indicates "difficulty in a wide variety of situations that require thinking and reasoning abilities." Ex. C at 8. This is further supported by his education records, in particular his IEP, which indicated that Mr. Bland's "academic and social needs warrant a placement of Integrated Co-Teaching in core subject areas," such as math and reading.

    Mr. Bland's verbal reasoning abilities as measured by the Verbal Comprehension Index (VCI) are in the borderline range and above those of only 7% of his peers. Dr. Fernandez's evaluation indicated that Mr. Bland's performance on this test required "abilities to verbalize meaningful concepts as well as to retrieve information from long-term memory." Ex. C at 9. Additionally, Mr. Bland scored in the borderline range on the Processing Speed Index (PSI) and above only 5% of his peers. Ex. C at 10. The weakness in Mr. Bland's processing of simple or routine information makes "the task of comprehending novel information more time-consuming and difficult for Mr. Bland," which explains the challenges he has demonstrated in comprehending his current legal involvement. Ex. C at 10.

    Dr. Fernandez also outlined that Mr. Bland presents with symptoms of Complex Post-Traumatic Stress Disorder (CPTSD), and struggled with discussing emotional topics, such as family relationships, previous environment, and experiences of abuse. He struggles with crying spells, isolation, and avoidance of certain topics. According to Dr. Fernandez, this is consistent with the CPTSD diagnosis as it is "predominantly characterized by emotional sensitivity and poor coping responses, such as the problematic use of cannabis and alcohol." Ex. C at 12.

5

In light of these findings, Dr. Fernandez opined that "Mr. Bland's lowered cognitive functions precludes his ability to utilize appropriate judgment." Ex. C at 11. Thus, given his clinical presentation, his special education history, and his low intellectual functioning, Mr. Bland is cognitively impaired. Indeed, his "lowered abilities can contribute to an impairment in appreciating the nature and impact of their behavior, which also make [a] person with this disorder vulnerable to manipulation and coercion." *Id.*

Given Mr. Bland's history and dynamic needs, Dr. Fernandez makes numerous recommendations for interventions that would ameliorate longstanding conditions that likely contributed to the instant offense. First, Dr. Fernandez recommends consistent treatment for Mr. Bland's marijuana and alcohol addictions as Mr. Bland has not been in any formal long-term treatment to address his severe level of substance use. Second, Dr. Fernandez recommended consistent adherence to psychiatric treatment, in the form of medication and psychotherapy, for his mental health. While medication would assist with Mr. Bland's depression and anxiety, Mr. Bland would also benefit from psychotherapy to address his cognitions and behaviors and develop healthy coping strategies. Additionally, Dr. Fernandez recommended vocational support to assist with Mr. Bland obtaining employment. Finally, given Mr. Bland's cognitive impairment, Dr. Fernandez recommended that he connect with the New York State Office for People with Developmental Disabilities to receive necessary services designed to assist the cognitively impaired with employment, social activities, care management, and building relationship within the community.

Mr. Bland is eager to follow through on Dr. Fernandez's recommendations. At MDC, he has begun taking Olanzapine and Escitalopram Oxalate for his depression, PTSD, alcohol abuse disorder and cannabis abuse disorder. The psychological treatment and vocational support Dr. Fernandez recommends, however, are not available to Mr. Bland at the MDC.

## Instant Offense

In June 2023, Mr. Bland, was shot three times by a stranger while walking home from a block party in the Bronx. He woke up at Lincoln Hospital to find his "mom, dad, wife, little siblings, and children crying." Ex. A. At Lincoln Hospital Mr. Bland was treated with a knee surgery and then released in a cast on June 15, 2023.

Just three days later, Mr. Bland was arrested when NYPD officers monitoring surveillance of a Bronx bodega saw him place a firearm on a shelf in the store and then later found marihuana on him during the arrest. At no point did Mr. Bland use the gun in a threatening or menacing manner. Rather, the gun remained untouched on top of the shelf for 17 minutes until the officers entered the bodega to execute the arrest. Mr. Bland was released from state custody the same day, arrested federally on July 17, 2023 and charged with Possession of a Firearm and Ammunition (18 USC § 922(g)(1) and (2)); Distribution of Controlled Substances (21 USC § 812, 841(a)(1) and 841 (b)(1)(D); 18 USC § 2, and Firearms Use, Carrying and Possessing, 18 USC § 924(c)(1)(A)(i) and (2). Mr. Bland was held first at Essex County Correctional Facility, then transferred to the MDC on October 26, 2023, where he has been held for the past year.

6

Mr. Bland is deeply remorseful for breaking the law, and though there was no victim to his nonviolent offense, understands that he has caused harm. Mr. Bland writes, "I am very sorry for everything I've done. It was disrespectful to the court, to the judicial system, to my family, and myself." Ex. A. The offense is not an indicator of who Mr. Bland is as a man, or of his character or potential. Mr. Bland has "realized the impact of his action. Now is the time for him to turn his life around," writes his father. Ex. B at 3, Letter of Gary Scott. "Despite this case and his mistakes, I still know Shatique to be an honorable individual and a valued member of his neighborhood, and just a good human being," writes Mr. Bland's Aunt. Ex. B at 6, Letter of Towana Bland Steven. Writes his partner, "I know that you may think Shatique will never change, but not only as his wife, but also as someone on the outside looking in, I know that my fiancée is now a changed man." Ex. B at 1, Letter of Felicita Aiken.

### When Considering the 3553(a) Factors in This Case, a Sentence 51 Months' Imprisonment is Sufficient Punishment for this Non-Violent Offense

A sentence longer than 51 months for Shatique Bland would be excessive. Although Mr. Bland deserves to be punished for illegally possessing a firearm, he is deeply remorseful, and the instant offense was non-violent and had no victim. Mr. Bland and the Government entered into a plea agreement stipulating the applicable guideline range to be 51 to 63 months. The Department of Probation recommends a sentence of 51 months. PSR at 30.

Justice demands that Mr. Bland not be subject to a sentence longer than 51 months. Mr. Bland suffers from serious intellectual disabilities, alcohol addiction, and the offense conduct in this case demonstrates that he is not a criminal mastermind. The conduct was wholly nonviolent in nature. Mr. Bland made no threats, no one at the bodega called 911 to report his conduct, and he made no attempts to use the firearm. Moreover, the drugs found on his person was marijuana, the quantity of which likely totaled approximately half an ounce. Although Mr. Bland understands the gravity of his actions that day, it is important to consider on balance the impact of distributing marijuana versus other controlled substances in the community, especially where 24 states – including New York – have now legalized recreational-use marijuana.

In fashioning an appropriate sentence, the Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision "directs sentencing courts to 'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)." *Id.* "Those factors are, broadly speaking, proportionality, deterrence, incapacitation, and rehabilitation." *Id.* The Court may not presume that the advisory Guidelines range is reasonable and must instead "make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). In making this assessment, the Court must "consider every convicted person as an individual," and its sentence must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (citations omitted).

For Mr. Bland, any sentence longer than 51 months would be "greater than necessary" to fulfill the statutory goals of sentencing. Indeed, a 51-month sentence is already highly punitive when accounting for Mr. Bland's dire mental and physical health in combination with

7

the horrible conditions of his pretrial detention and the pressing need for him to support his family.

      **A.**   *Mr. Bland's Familial Circumstances and Future Plans*

Mr. Bland is a loving husband and father of two, whose family relies on him for financial and emotional support and care. He is a mentor and caregiver to his family and local community, and his absence has been dearly felt over the past year. Mr. Bland also has plans for the future and the full love and support of his community in achieving those plans after he serves his time. In their letters to this Court, each of his family members describe different aspects of Mr. Bland's caring, loving and helpful personality and behavior, and outline the hardship they have faced, both individually and as a community, during his incarceration.

With Mr. Bland's detention, his partner Felicita Aiken is left to care for their young son ▓▓▓ and Mr. Bland's stepson, ▓▓▓ who has ADHD, on her own. Ms. Aiken is also dealing with significant medical issues without a partner's support. She suffered a traumatic miscarriage shortly after Mr. Bland's arrest, and has abscesses on her brain, caused by a brain infection and fungus. Ms. Aiken is undergoing medical treatment, but the brain abscesses cause her to be forgetful, to the point where she leaves notes around the house to remind herself of basic things. Because of this medical condition, caring for two young boys alone has become particularly challenging, especially since, without Mr. Bland's guidance, ▓▓▓ is now "struggling… get[ting] into trouble in school and… fighting with other kids." Ex. B at 1, Letter of Felicita Aiken. The principal asked ▓▓▓ and Ms. Aiken what could be done about his behavior, and ▓▓▓ "just said that he wants his stepdad." *Id.* Mr. Bland's children and partner count on him as a "big role model in [the] family," and feel his absence tremendously. *Id.*

Mr. Bland's father, Mr. Scott, also writes that Mr. Bland's incarceration is "hard on me," since Mr. Bland used to take Mr. Scott to his medical appointments. Mr. Scott also observes that "[Mr. Bland's] wife and son are really struggling without him around now." Ex. B at 3, Letter of Gary Scott.

While incarcerated at MDC, Mr. Bland has not acquired a single disciplinary infraction, and has attended education courses in Origami, Parenting Modified Operations, Effective Communication and CDL. *See* MDC Certificates, attached as Exhibit D. Mr. Bland has a 10-year release plan, and after serving his time, he plans to get a trucking license and move away from New York City with his family. He is eager to follow up on Dr. Fernandez' recommendations, and his family is "ready and willing to support him," helping him find work and treat his psychological and physical conditions. Ex. B at 3, Letter of Gary Scott. His parents both have steady jobs and his mother is looking for homes in Delaware and Pennsylvania for the family to move to for a fresh start. His aunt writes, "I feel strongly about the goodness of his character and giving heart that he will continue to look out for his family and the people close to him, if given the opportunity." Ex. B at 6, Letter of Towana Bland Steven. His partner, Ms. Aiken, writes "I pray that you let him show you that he can succeed in life, but he can't do that while being in jail… Please give my fiancée, Shatique, one last chance to prove that he can be the best version of himself and is more than his criminal history. I know if you allow him this chance, he will never return to prison." Ex. B at 2, Letter of Felicita Aiken.

### B. *The Horrific Conditions of Mr. Bland's Pretrial Detention Must be Considered When Fashioning a Sentence*

Since Mr. Bland's June 2023 arrest, he has been the vast majority of his time detained at the MDC, a facility that has been harshly criticized by many courts in this District. Judge Berman has said that the MDC is "dirty," "infested with drugs," and there is a prevalence of "violence." *United States v. Moran*, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), ECF No. 90, Tr. 12-15, 37. Judge McMahon has described the conditions at the MDC as "disgusting [and] inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that." *United States v. Days*, 19 Cr. 619 (CM) (S.D.N.Y. Apr. 29, 2021), ECF No. 35, Tr. 19. These conditions have not improved over the years; to the contrary, staffing shortages and other security concerns have resulted in constant lockdowns, during which Mr. Bland and other prisoners are denied the most basic level of care: access to showers, medical treatment, phone calls with their families. As MDC corrections staff explained in a June 23, 2023 letter to BOP leadership:

> The [BOP's] actions are inhumane to both staff and inmates, as the institution remains locked down on several occasions, which angers the inmates and heightens the inherent danger for staff. Coverage is so minimal that at times there are only 6 staff members available to respond to body alarms, staff assists, and or inmate medical emergencies.

Indeed, during Mr. Bland's fifteen months of incarceration at the MDC, he has been subject to severe physical and psychological distress. He has witnessed numerous stabbings and deaths. Ex. A. These events were particularly terrifying for Mr. Bland, who is the recent victim of several near-death injuries. Mr. Bland fears for his life and almost never leaves his cell. *Id.* At the MDC, he has been diagnosed with Post-Traumatic Stress Disorder and Major Depressive Disorder, and reported to BOP Health Services that he suffers from nightmares about being shot again. At MDC, Mr. Bland has not received any much-needed physical therapy for the ongoing pain and complications of the shooting he was recently victim to even though the court ordered as much at his detention hearing. As a result, he suffers physical pain, and he walks with a limp.

While detained, Mr. Bland has not had the much-needed support of his partner and parents because of the lockdowns, a faulty mail system, and scant access to phone. The lockdowns, which have remained frequent and lengthy, have caused psychological turmoil for Mr. Bland. For example, on December 15, 2023, Mr. Bland received written notice from BOP that MDC would begin a lockdown that did not lift until January 17, 2024 – over a month later. On March 21, 2024, Mr. Bland received a similar letter informing him of a lockdown, which lasted until May 3, 2024 – over a month and a half later. Again, on June 7, 2024, Mr. Bland received another letter from BOP informing him of a lockdown due to the murder of fellow inmate; this time the lockdown ended on July 16, 2024 – over a month later. Cruelly, the next day, on July 17, 2024, Mr. Bland again received a letter from BOP informing him a new lockdown period would begin due to a second inmate's murder in the facility. This lockdown, lasted until August 26, 2024 – a month and a half later. These lockdowns have led to feelings of isolation, terror, and loneliness and have only worsened Mr. Bland's psychological state.

Numerous courts in this District have recognized that excessively punitive conditions in pre-sentencing detention, like those Mr. Bland has endured for the past fifteen months, warrant consideration when fashioning sentences.  "It has gotten to the point that it is routine for judges in both [the Southern] District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC."  *United States v. Chavez*, No. 22-CR-303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan. 4, 2024); *see, also, e.g.*, *United States v. Phillibert*, 15 Cr. 647 (PAE), 2021 WL 3855894, at *4 (S.D.N.Y. Aug. 27, 2021) ("Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by courts in measuring a just sentence."); *United States v. Barreto*, 19 Cr. 909 (KPF) (S.D.N.Y. June 27, 2023), Tr. 57:7-12 (stating that challenging pretrial confinement conditions have been and will continue to be a basis for a downward variance); *United States v. Carter*, 22 Cr. 271 (LTS) (S.D.N.Y. Mar. 22, 2023), ECF No. 33, Tr. 29:23–30:1 (varying downward in light of, in part, "harsh conditions of confinement").

Over the past six months, judges in the Southern and Eastern Districts have imposed below-guidelines or time served sentences, granted motions of compassionate release, and ordered pre-surrender liberty to defendants based on the consistently horrific conditions at the MDC.  *See, e.g.*, *Chavez*, No. 22-CR-303 (JMF), 2024 WL 50233, at *6 (ordering that a narcotics defendant remain at liberty pending surrender, based largely on the conditions at MDC); *United States v. Griffin*, No. 22-CR-408 (EK), 2024 WL 2891686, at *3 (E.D.N.Y. June 10, 2024) (granting a motion for compassionate release based on the conditions at the MDC); *United States v. Santana*, No. 22 CR. 368 (VM), 2024 WL 2275037, at *2 (S.D.N.Y. May 20, 2024) (reducing a sentence from 156 months to 114 months' imprisonment, in part due to "severe conditions that prevail at the MDC (conditions that amount to imposing harsher punishments on prisoners)").

In August 2024, in a decision based largely on the abominable conditions at the MDC, Judge Brown in the Eastern District of New York imposed a sentence of nine months to a defendant with sentencing guidelines of 18 to 24 months.  *United States v. Colucci*, Case No. 23-CR-417 (GRB), 2024 WL 3643857 (E.D.N.Y. Aug. 5, 2024).  In his decision to impose a sentence significantly below the guidelines, Judge Brown noted that the "dangerous, barbaric conditions" at the MDC "bear heavily on the decision of the court."  Id. at 1, 7.  Judge Brown observed that "[c]haos reigns, along with uncontrolled violence" at the jail, noting that several recent violent incidents demonstrated "a woeful lack of supervision over the facility, a breakdown of order and an environment of lawlessness within its confines that constitute unacceptable, reprehensible and deadly mismanagement."  Id. at 5, 7.

These are precisely the conditions Mr. Bland, a man suffering from learning disabilities, PTSD, and fresh gunshot wounds, has been subject to for over a year.  As Judge Marrero wrote in *Santana*, these "conditions… amount to imposing harsher punishment."  2024 WL 2275037 at *2.  The brutal, punishing conditions Mr. Bland has suffered under at the MDC warrants consideration when fashioning a fair and just sentence in this case.

## Conclusion

Justice would not be served by giving Mr. Bland a sentence beyond 51 months' imprisonment in this case. Mr. Bland's 15 months of pretrial incarceration have been more

punitive than anticipated or warranted.  Without access to necessary physical therapies and medical treatment, Mr. Bland's recovery from his gunshot wounds has been challenging and his gait permanently impacted.  Given Mr. Bland's poor mental and physical health, familial circumstances and the unequivocally dire conditions at MDC, Mr. Bland's sentence should appropriately account for that.  Simply put, Mr. Bland will never do anything like this again.  According to Dr. Fernandez, Mr. Bland would benefit from interventions targeted towards dynamic needs that contributed to the circumstances of his current involvement with the justice system.  None of these interventions have been available to Mr. Bland during his incarceration.  With continued supervision, programming, employment, and familial support, there is no doubt that Mr. Bland will succeed in living a law-abiding life upon release.

      Thank you for your consideration of this request.

      Very Truly Yours,

/s/ *Marisa K. Cabrera*
Marisa K. Cabrera
Assistant Federal Defender
Federal Defenders of New York